UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Associated Electric & Gas Insurance
Service et al.,

    Plaintiffs,

v.                                                                      **MEMORANDUM OPINION
&amp; ORDER**
Civil No. 14-1602

BendTec, Inc.,

    Defendant.

_____

    George M. Ferreti and Peter N. Billis, Foran Glennon Palandech Ponzi and Rudloff PC, and Chad Stepan and Darren Hepper, Meagher & Geer, P.L.L.P., Counsel for Plaintiffs.

    David A. Schooler, Daniel N. Moak and W. Knapp Fitzsimmons, Briggs and Morgan, P.A., Counsel for Defendant.

_____

    This matter is before the Court on Defendant's motion for summary judgment.

**I.    Introduction**

    Plaintiff Public Service Company of New Hampshire ("PSNH") is a subsidiary of Northeast Utilities ("NU").  (Comp. ¶ 4.)  Plaintiff Northeast Utilities Services Company("NUSCO") is a wholly-owned subsidiary of NU, and

1

provides administrative support for NU subsidiaries, including PSNH. (Id.)

PSNH operates a commercial power generation facility in Bow, New Hampshire that is referred to as the Merrimack Station. (Ferreti Decl. Ex A (Gruwell Decl. ¶ 4).) The Merrimack Station has two turbine generators and two coal fired boilers, designated as "Units 1 and 2". (Id. at ¶ 5.) Unit 1 was built in 1960, and has a rated capacity of 113.5 megawatts ("MW"). Unit 2 was built in 1968 and had an output of 349 MW. Each Unit is provided with dedicated condensate, boiler feedwater and steam systems. (Id. at ¶ 8.)

The steam turbine used to drive the generator for Unit 2 has three major components: high pressure (HP) and intermediate pressure (IP) turbine contained in a common casing; and two low pressure turbines (LP-1) and (LP-2) that are housed in separate casings. (Id. ¶ 9.) Steam that is produced in the boiler flows into the HP turbine at a pressure of 2,400 pounds per square inch gauge and a temperature of 1,005°F. (Id. ¶ 10.) Steam exhausted from the HP turbine is routed back to the boiler, reheated, then flows through the IP turbine and is exhausted in the LP turbines. (Id. ¶¶ 11, 12.)

In late 2006, NUSCO, as agent for PSNH, purchased a new 340 MW HI-IP Turbine and related downstream equipment from Siemens Power Generation,

Inc. (Id. ¶ 13.) The new turbine was expected to increase output of Unit 2 by an estimated 10 MW without an increase in steam flow. (Id. ¶ 14.) In addition to supplying the new generator rotor and turbine, Siemens also agreed to procure the manufacture, supply and installation of all necessary components, including turbine piping. (Id. ¶ 15; Fitzsimmons Aff. Ex. B ("Agreement").) Siemens also warranted that all equipment, materials and supplies furnished by or through Siemens was free from defects. (Agreement, Article 11.5.) The new turbine was installed by Siemens from March to May 2008. (Gruwell Decl. ¶ 15.)

The turbine piping is part of the system of pipes which convey high pressure steam from a boiler to the turbine. (Id. ¶ 16.) The turbine piping connects the control valves, which consist of two throttle valves and eight governor valves, to the turbine. (Id.) Defendant BendTec, Inc. ("BendTec") was the subcontractor chosen by Siemens to fabricate the turbine piping. (Zimpel Aff., Ex. A.) BendTec fabricated the turbine piping to Siemens' specifications and cleaned the interior of the piping via abrasive grit blasting. BendTec then conducted a visual inspection of the piping, capped it and shipped it to the Merrimack Station. (Fitzsimmons Aff., Ex. I (Interrogatory No. 5).) The piping was delivered to the Merrimack Station no later than April 8, 2008. (Id., Ex. J

3

(SIEMENS000891).)  After delivery, the piping, turbine and related materials were installed at the direction of Siemens in the Spring of 2008.  (Id., Ex. I (Interrogatory No. 7).)

On May 22, 2008, the new turbine was started for the first time.  (Gruwell Decl. ¶ 22.)  Plaintiffs claim that output from the new turbine was less than the original turbine.  (Id.)  Siemens investigated the problem for weeks, but was unable to determine the cause of the power shortfall without opening up the new turbine's casing.  (Id. ¶ 23.)  After opening the casing, steel grit blast material was discovered throughout the new turbine, the two pre-existing LP turbines and other downstream equipment.  (Id. ¶ 24.)  Plaintiffs and Siemens determined that grit blast material was blown into the turbine by the high pressure steam when the turbine was started up.  (Id.)  The grit blast material was removed from the affected equipment, and the turbine was restarted on July 14, 2008.  (Id. ¶ 25.)  The turbine operated with decreased efficiency until August 2009, when replacement turbine blades and other components were finally available for installation.  (Id. ¶ 26.)

As part of its manufacturing process for turbine piping, BendTec cleans the outside diameter and the inside diameter of the piping by using a grit

blasting process. (Zimpel Dep. at 28-30.) Using blasting equipment, steel grit is sprayed at the piping at approximately 100 PSI. (Id. at 25-27.) The piping is then visually inspected, the ends capped and the product shipped. (Id. at 65.)

BendTec's project manager, Clint Zimpel, testified that the turbine piping was visually inspected before shipment with a flashlight. (Id. at 115-16.) Plaintiffs claim that the length and curvature of several of the pipes is such that one could not inspect the entirety of the interior of the piping by using a flashlight only. (Traubert Dep. at 212-214.)

Upon delivery of the turbine piping from BendTec to PSNH, it was stored at PSNH's yard until Siemens was ready to attach it to the turbine equipment. (Gruwell Decl. ¶ 20.) When ready to install, the piping was moved into place by crane, uncapped and attached to the turbine on one end and the two throttle valves and governor valves at the other end. (Id. ¶ 20.)

To install the new turbine, Siemens was not required to make any modifications to the existing building that housed the turbines, or new construction. (Id. ¶ 19.) The turbine generators are protected by a casing. Further, the appropriate equipment, turbines and turbine piping can be easily removed from the structure that houses them. (Id.)

Plaintiffs brought this action against BendTec on May 21, 2014, alleging BendTec had a duty to exercise ordinary care consistent with industry practices in inspecting the turbine piping. Plaintiffs further allege that BendTec breached this duty by failing to ensure that its piping was free of any foreign object debris ("FOD") before shipping it to the Merrimack Station. Plaintiffs claim the FOD caused physical damage to the turbine and related equipment and caused damages in the form of replacement power losses, valued at over $30 million.

Plaintiff insurance companies, Associated Electric & Gas Insurance Services, Zurich American Insurance Company and Energy Insurance Mutual Limited paid an amount in excess of $30 million for the damages allegedly suffered by BendTec.

**II.   Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).  The party opposing summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### III.   Discussion

#### A.   Two Year Limitation Pursuant to Minn. Stat. § 541.051

The question before the Court is whether the single negligence claim asserted in the Complaint arises out of an improvement to real property and is thus governed by the two-year limitations period set forth in Minn. Stat. § 541.051 subd. 1 which provides:

> (a) Except where fraud is involved, no action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, shall be brought against any person performing or furnishing the design, planning, supervision, materials, or observation of construction or construction of the improvement to real property or against the owner of the real property more than two years after discovery of the injury, nor in any event shall such a cause of action accrue more than ten years after

substantial completion of the construction. Date of substantial completion shall be determined by the date when construction is sufficiently completed so that the owner or the owner's representative can occupy or use the improvement for the intended purpose.

Pursuant to Minnesota law, an improvement to real property is defined as "[a] permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." Lietz v. N. States Power Co., 718 N.W.2d 865, 869 (Minn. 2006). In addition, the statute applies to manufacturers of materials to be used in an improvement to real property. See Calder v. City of Crystal, 318 N.W.2d 838, 843 (Minn. 1982) (finding that § 541.051, subd. 1 applies to manufacturer of component parts used in connection with improvement to real property). Courts must use a "common sense interpretation" when determining whether a claim involves an improvement to real property. Siewert v. N.S.P Co., 793 N.W.2d 272, 286 (Minn. 2011) (citing Pac. Indem. Co. v. Thompson-Yaeger, Inc., 260 N.W.2d 548, 554 (Minn. 1977), superseded by statute, Minn. Stat. § 541.051 (1980) as recognized in O'Brien v. U.O.P., Inc., 701 F Supp. 714, 717 (D. Minn. 1988)).

Applying a common sense interpretation to the statutory language, the

Minnesota Supreme Court found that the installation of a utility pole anchor was an improvement to real property.  Lietz, 718 N.W. 2d at 871.  See also Kline v. Doughboy Recreational Mfg. Co., 495 N.W.2d 435, 439 (Minn. Ct. App. 1993) (applying Minn. Stat. § 541.051 to claim involving swimming pool, as court found installation of swimming pool was an improvement to real property); Patton v. Yarrington, 472 N.W. 2d 157, 160 (Minn. Ct. App. 1991) (finding that smoke detectors are an improvement to real property, and claims of defective smoke detectors subject to two year statute of limitations); Olson v. Warm Prod., Inc., No. A12-2226, 2013 WL 3779323, at *7 (Minn. Ct. App. Oct. 15, 2013) (finding that roman shade attached to cabin was an improvement to real property).

In Harder v. ACandS, the Eighth Circuit held that a steam turbine installed at an Iowa power plant was an improvement to real property, and that insulation blankets affixed to those steam turbines were improvements to real property.  179 F.3d 609, 612-613 (8th Cir. 1999).  As a result, the court found that claims alleging the insulation blankets were defective were subject to Iowa's statute of repose involving improvements to real property.  Id.  In so finding, the court noted that Iowa courts defined improvements to real property as "a permanent addition to or betterment of real property that enhances its capital

9

value and that involves the expenditure of labor or money and is designed to make the real property more useful or valuable as distinguished from ordinary repairs." Id. (citation omitted). This definition is the same as used by Minnesota courts. See Lietz, 718 N.W.2d at 869.

Here the Merrimack Station is a commercial power generation facility that consists of two turbine generators. The purchase and installation of the steam turbine and turbine piping for the Unit 2 generator was a permanent fixture intended to increase the output of the Unit 2 turbine generator. As such, the turbine piping constitutes a betterment of the real property of the Merrimack Station, that enhanced its capital value, and which involved the expenditure of labor and money. Accordingly, the Court finds that the turbine piping was an improvement to real property.

Plaintiffs respond that the two year limitation period does not "apply to the manufacturer or supplier of any equipment or machinery installed upon real property." Minn. Stat. § 541.051(e). Plaintiffs bear the burden of demonstrating the exception applies. Integrity Floorcovering, Inc. v. Broan-Nutone, LLC, 521 F.3d 914, 919 (8th Cir. 2008) (quoting State Farm Fire and Cas. v. Aquila, 718 N.W.2d 879, 886 (Minn. 2006)). In addition, such exception to the limitations

period should be used only in exceptional circumstances.  Id.

    Plaintiffs argue the legislative intent behind subdivision (e) was "to distinguish building materials—'which are incorporated into construction work outside the control of their manufacturers or suppliers, at the direction of architects, designers, and contractors'—from machinery and equipment—which 'are subject to close quality control at the factory and may be made subject to independent manufacturer's warranties.'"  Olson, 2013 WL 3779323, at *8 (quoting Red Wing Motel Investors v. Red Wing Fire Dep't, 552 N.W.2d 295, 297 (Minn. Ct. App. 1996)).  Plaintiffs further argue "equipment or machinery" is typically considered as "large scale items, which are not integral to or incorporated into the building, and could exist separately from the building structure."  Integrity Floorcovering, Inc. v. Broan-Nutone, LLC, 521 F.3d 914, 920 (8th Cir. 2008) (citing cases).

    Plaintiffs argue that the turbine piping falls within this exception because the building that houses the turbine did not have to be modified in any way in order for the new turbine to be installed.  Further, the sole function of the turbine piping is to transport high pressure steam into the turbine to facilitate the production of electricity.  Thus, the turbine piping should be considered

equipment or machinery installed upon real property.  Plaintiffs also note that the turbine piping is subject to close quality control at the factory and that it is a large scale item.  Thus, it should be considered equipment or machinery that is included within § 541.051(e).

In response, BendTec asserts the turbine piping should be considered "building materials" rather than "equipment/machinery" because BendTec fabricated the piping pursuant to Siemens' specification, shipped the piping to the power plant and thereafter had no further involvement with the project.  The turbine piping was installed at the direction of Siemens and its subcontractors.  BendTec points out that Minnesota courts have found that pipes constitute ordinary building materials, not equipment or machinery.  See Red Wing Motel, 552 N.W.2d at 297 (finding that pipes and sprinkler heads are ordinary building materials, not machinery or equipment); Auto-Owners Ins. Co. v. Wensmann Homes, Inc., No. A10-796, 2011 WL 69086, at *2 (Minn. Ct. App. Jan. 11, 2011) (same); Aquila, 718 N.W.2d at 884 (finding natural gas pipeline system qualified as an improvement to real property).

The Court finds that Plaintiffs have not met their burden of showing that the exception for equipment or machinery under § 541.051 applies here.  Instead,

the turbine piping is more akin to building materials as it was fabricated pursuant to Siemens' specifications and it has no independent function on its own. Further, once the turbine piping was produced and shipped, BendTec had no further involvement with the piping or its installation.

As the turbine piping is a component of an improvement to real property, the two year statute of limitation set forth in Minn. Stat. § 541.051 applies. By Plaintiffs' admission, Plaintiffs discovered their alleged injury no later than late May 2008 when PSNH identified certain performance issues with the turbine. Plaintiffs did not commence this case until May 2014, however. Accordingly, Plaintiffs' claims against BendTec are time-barred.

### B. Merits Determination

Even if the claim was timely, BendTec is nonetheless entitled to judgment as Plaintiffs' claim fails on its merits. The elements of a negligence claim are: "(1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer injury." Schweich v. Ziegler, Inc., 463 N.W.2d 722, 729 (Minn. 1990).

Plaintiffs entered into a contract with Siemens for the purchase and installation of a steam turbine and its related parts. Thereafter, Siemens entered

into a subcontract with BendTec for the purchase of the turbine piping.  As a result, BendTec had no contractual duties to Plaintiffs.

Under Minnesota law, a negligence claim fails where the plaintiff "cannot demonstrate a duty independent of the duty established by contract."  Lansing v. Concrete Design Specialities, Inc., No. A05-1543, 2006 WL 1229638, at *5 (Minn. Ct. App. May 9, 2006).  In Lansing, the court held that a negligence claim asserted against a subcontractor by the homeowners failed on the merits as the homeowners did not establish the subcontractor owed them a duty imposed by law.  "The duty that [subcontractor] owed to [homeowners] to install the driveway using proper workmanship to obtain the desired surface does not exist outside of the contract.  Consequently, [homeowners] failed to state a claim for negligence as a matter of law."  Id.  See also Tarin's Inc v. Tinley, 3 P.3d 680, 685 (N. M. Ct. App. 1999) ("Absent privity, a subcontractor owes no duty to a property owner."); Grgic v. Cochran, 689 S.W.2d 687, 690 (Mo. Ct. App. 1985) ("Owners' theory of tort liability also must fail.  The liability of a contractor to an owner for defective construction is based either on breach of contract or warranty").  Any duty BendTec had regarding the manufacture of the turbine

piping did not exist outside the contract between Siemens and BendTec.[1]

IT IS HEREBY ORDERED that Defendant BendTec, Inc.'s Motion for Summary Judgment [Doc. No. 39] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY

Date:   June 24, 2015

s/ Michael J. Davis  
Michael J. Davis  
Chief Judge  
United States District Court

---

[1] Siemens, on the other hand, was the general contractor and therefore had the contractual duty to Plaintiffs to ensure that a non-defective turbine and related materials was properly installed.  See Brasch v. Wesolowsky, 272 Minn. 112, 117, 138 N.W.2d 619, 623-24 (1965) (finding general contractor owes contractual duty to contractee, and that such duty is nondelegable).  Nelson v. Vogt, Nos. C9-97-670, C4-97-1161, 1998 WL 15660 at *3 (Minn. Ct. App. Jan. 20, 1998) (finding general contractor ultimately responsible for defective construction or materials provided by subcontractor).